UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

JOHN BURKS,

        Plaintiff,

                                     Case No. 20-cv-782-pp

    v.

OFFICER JASON TATE,
OFFICER MATTHEW WIERZCHOWSKI,
CHIEF ALFONSO MORALES,
OFFICER ROSS LAUTENBACH,
MILWAUKEE POLICE DEPARTMENT,
MAYOR TOM BARRETT,
THE MILWAUKEE FIRE AND POLICE COMMISSION
and CITY OF MILWAUKEE,

        Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY (DKT. NO. 103)**

---

The plaintiff, who is representing himself, sued eight defendants under 42 U.S.C. §1983, alleging that officers conducted a search of his home (when he was not present) after officers received a 911 call that two men were removing televisions from it. Dkt. No. 1. The incident was captured on the officers' body cameras. Officers discovered an open side door. Once inside, they discovered the entry point—a broken window that one of the officers said only a "fucking midget" could fit through. Dkt. No. 107-2 at T01:06:49Z. Officers cleared the first floor, attic and basement and stated that the bedroom looked like someone "might have went through the drawers." Id. at T01:07:20Z. At least one of the officers said it didn't look like anything had been taken. Id. at T01:07:34Z. The officers continued their search, and, in the kitchen, found a

firearm located on the top shelf of a cabinet with glass doors. Id. at T01:09:30Z. Defendant police officer Matthew Wierzchowski called the district counsel operator and learned that the firearm was not stolen; the officers questioned whether they could keep the firearm but nonetheless decided to take it for "safekeeping." Id. at T01:13:44Z, T01:19:14-1:20:08Z. The officers opened cabinets and drawers, finding a lot of things in the home, from large batteries, Trojans and cognac, dkt. no. 106-2 at T01:04:43-48Z, to a Sterno on the stove, id. at T01:09:05Z. This led them to speculate that whoever lived in the house—or the occupant's houseguest or friend—may have been stealing power, may have gotten out of the "pokey," id. at T01:18:06Z, may have been cooking crack, id. at T01:09:09Z, or may have been a "freaking homeless person," dkt. no. 112-1 at 20. While the officers stated that they didn't know who owned or occupied the home, they eventually found a bus ticket, checkbook and property tax bill with the owner's—the plaintiff's—name. Dkt. No. 106-2 at T01:17:29Z. On the way out of the house, one of the officers declared that the firearm had been stolen. Dkt. No. 107-2 at T01:22:13Z. It appears that the defendants did not try to contact the plaintiff regarding the break in or their investigation until after the plaintiff filed his complaint; the plaintiff says that he has not been able to get his gun back. Dkt. No. 112 at 24.

The operative complaint alleges violations of the Fourth and Fourteenth Amendments.[1] Dkt. No. 45. The plaintiff specifically alleges an illegal search,

---

[1] The plaintiff filed his original complaint on May 22, 2020. Dkt. No. 1. On June 22, 202, he filed a motion to supplement the complaint. Dkt. No. 7. Ten days later, he asked to withdraw the supplement, but not the motion for *leave* to supplement. Dkt. No. 13. The defendants answered the original complaint. Dkt. No. 16. On July 30, 2022, the plaintiff filed another proposed supplemental complaint. Dkt. No. 22. He also filed a proposed amended complaint. Dkt. No. 24. Forty-five days later, the plaintiff filed a motion to amend/correct the complaint, dkt. no. 42, along with a proposed "First

2

an illegal seizure, intimidation, fabrication of evidence, selective enforcement, negligent infliction of emotional distress, failure to train, failure to supervise and an Equal Protection violation. Id.

The defendants have filed a motion for summary judgment. They argue, in part, that exigent circumstances supported the search. They point out that the plaintiff never was arrested: they maintain that they were searching on the plaintiff's behalf. Dkt. No. 115 at 3, 4. They assert that if the court concludes that exigent circumstances did not exist, they are entitled to qualified immunity. Id. at 4.

The court must dismiss some of the defendants and some of the claims, but will allow the plaintiff to proceed on his Fourth Amendment claims against the officers who conducted the search and seized the gun.

## I.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

---

Amended Complaint," dkt. no. 42-1. On October 13, 2020, the court issued an order. Dkt. No. 43. It denied the plaintiff's motions to supplement the complaint but granted his most recent motion to amend the complaint; it ordered that the document at Dkt. No. 42-1 would be the operative (second amended) complaint and ordered the defendants to respond to that pleading. Id. at 17. The same day that the court issued that order, the clerk's office received from the plaintiff *another* motion for leave to file an amended complaint. Dkt. No. 44. Along with that motion, he filed another copy of the document titled "First Amended Complaint." Dkt. No. 45. The clerk's office docketed this pleading as the "second amended complaint." The defendants answered this version of the operative complaint. This order treats the amended complaint at Dkt. No. 45 as the operative complaint.

3

(1986). A dispute over a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A moving party "is 'entitled to a judgment as a matter of law'" when "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Still,

> a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Id. (internal quotation marks omitted).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. See Heft v. Moore, 351 F.3d 278, 282 (7th Cir. 2003) (citing Liberty Lobby, 477 U.S. at 255). "However, [the court's] favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." Fitzgerald v. Santoro, 707 F.3d 725, 730 (7th Cir. 2013) (quoting Harper v. C.R. Eng., Inc., 687 F.3d 297, 306 (7th Cir. 2012)). That is, "to survive summary judgment, the non-moving party must establish some genuine issue for trial 'such that a reasonable jury could return a verdict' in her favor." Fitzgerald, 707 F.3d at 730 (quoting Makowski v. Smith Amundsen LLC, 662 F.3d 818, 822 (7th Cir. 2011)).

4

## II.     Findings of Fact

The plaintiff responded to the defendants' proposed findings of fact, dkt. no. 111, but did not file his own.[2]

On December 2, 2019, a 911 call was entered into the Milwaukee Police Department dispatch system; the caller stated that two men were observed taking televisions from the residence at 4041 N. 45th Street. Dkt. No. 111 at ¶8. Sometime between 6:30 and 7:00 p.m., Officers Lautenbach and Wierzchowski arrived at the property. Id. at ¶10. Officer Tate also went to the property. Id. at ¶11. The officers did not know who owned or lived at the property. Id. at ¶12. Lautenbach, however, remembered that when he arrived, he saw a "For Sale" or "For Rent" sign in the front yard and assumed the property was for sale. Dkt. No. 106 at ¶12.

The officers discovered an open side door; sometime later they discovered a broken window. Dkt. No. 111 at ¶14. Lautenbach and Wierzchowski entered the property to either investigate whether there was a burglary in progress or whether a burglary had occurred. Id. at ¶15. Lautenbach and Wierzchowski first cleared the main level, then Wierzchowski went to the attic and

---

[2] The plaintiff did not comply with this court's Civil Local Rule 56(b)(2), even though the defendants provided him with that rule in their summary judgment motion. See Dkt. No. 103 at 2-4. The rule requires a party opposing a motion for summary judgment to file "a memorandum of law;" Rule 56(b)(8)(A) limits the length of that single memorandum to thirty pages. The plaintiff filed *three* briefs: one totaling twenty-seven pages (Dkt. No. 112), a second totaling twenty-nine pages (Dkt. No. 113) and a third containing two pages (Dkt. No. 114). The court understands that the plaintiff is not a lawyer, but "[e]ven pro se litigants are obliged to follow procedural rules." McCurry v. Kenco Logistics Services, LLC, 942 F.3d 783, 787 n.2 (7th Cir. 2019) (citing Members v. Paige, 140 F.3d 699, 702 (7th Cir. 1988)). The court has not penalized the plaintiff, particularly given that much of the second brief appears to have been copied from the first; as it explains below, it is using the arguments in the most comprehensive brief. In the future, however, the court expects the plaintiff to follow the procedural rules, just as the lawyers are required to do.

5

Lautenbach went to the basement of the property. Id. at ¶16. Tate initially remained outside. Id. at ¶17. Lautenbach and Wierzchowski did not encounter any occupants in the property. Id. at ¶18. Lautenbach opened a door for Tate to enter and Tate, Lautenbach and Wierzchowski walked through the property again. Id. at ¶19.

There is body camera footage of the search inside the property. Dkt. Nos. 106-2, 107-2, 109-2. Officers observed large batteries, propane tanks, hand wiring and electrical cords strewn throughout the property. Dkt. No. 111 at ¶23. At one point on the camera footage, an officer said, "good for him, man, not paying WE Energies." Dkt. No. 106-2 at T01:08:26Z. Lautenbach stated that he thought the owner "must of done electrical stuff in the military because this man is like an evil genius about electrical stuff." Id. at T01:14:04-14Z.

Lautenbach shined his flashlight into the glass cabinet in the kitchen and saw a firearm on the top shelf. Dkt. No. 45 at ¶20; Dkt. No. 106 at ¶¶17; Dkt. No. 109-2 at T01:08:24Z. Lautenbach opened the cabinet door, removed the firearm and handed it to Wierzchowski. Dkt. No. 111 at ¶27; Dkt. No. 109-2 at T01:09:28Z. Wierzchowski called the dispatch officer to determine whether the firearm was stolen and learned that the serial number matched a stolen firearm of a different description but that the firearm Wierzchowski had described was not stolen. Id. at ¶¶28, 29. The officers continued to search the property and one of the officers said, "let's make sure we aren't leaving anything else behind." Dkt. No. 106-2 at T01:13:31-33Z. Another officer—after confirming that the firearm wasn't stolen—suggested that the officers "inventory it for safekeeping." Id. at T:1:13:48Z.

Officers returned to the basement, opened a cabinet door, id. at T01:16:31Z, warned about the smell inside the fridge, id. at T01:16:46Z, and

6

noted a "prison tv," id. at T01:17:01-09Z. They found the name "John Burk" on a property tax bill. Id. at T01:17:31Z. They also found a checkbook for John Burk and speculated that there was a guy who was staying in the basement after getting out of the pokey. Id. at T01:17:47-18:06Z.

After going through the basement, an officer (perhaps Lautenbach) said, "I think we've pretty much exhausted this. We know there's no other firearms laying out. But I mean do we take that one for safekeeping?" Id. at T01:18:59-1:19:17Z. After a moment, he[3] said, "I mean if we secure the house." Id. at T01:19:17-19Z. A second officer said "But if it's coming back stolen . . . ." Id. at T01:19:19-27Z. The first officer emphasized, "It's not with that name though" and reiterated, "She said it's not coming back stolen." Id. at T01:19:27-34Z. On the way back up the stairs, an officer asked "who's at counsel tonight . . . who's desk sergeant?" Id. at T01:18:59Z-1:20:16Z.

Lautenbach was aware that removing firearms for safekeeping purposes is allowed by Wisconsin law and the City of Milwaukee Police Department's Standard Operating Procedure (SOP) 560. Dkt. No. 106-3; 106 at ¶¶39, 40. Lautenbach averred that officers are allowed to take firearms for protection from loss, theft, misuse, damage or due to owner's incapacity when there are no other means to safeguard the property. Dkt. No. 106-3. The officers did not know who owned the firearm because there is no firearms registry in the state of Wisconsin; the plaintiff asserts, however, that MPD *does* use an ATF/NCIC National Gun Registry for lost or stolen guns. Dkt. No. 111 at ¶34. The officers averred that they did not want to leave the firearm in a likely-to-be-boarded-up

---

[3] It is difficult to tell whether the officer who says, "I mean if we secure the house" is the same officer who said "But I mean do we take that one for safekeeping?" The court has assumed it was the same officer based on the use of the filler words "I mean."

property that was unsecured, out of concern that a person could enter the property and take, steal or misuse the firearm. Id. at ¶35.

After walking through the property and finding the two open access points (the side door and the broken window) but no indication that anything was missing, the officers left the property. Id. at ¶36. Tate stayed behind at the property to wait for City Department of Public Works employees to board up the broken window. Id. at ¶37.

As they were leaving the property, Lautenbach and Tate encountered an individual in the public right of way and asked him if he knew who lived at the property. Id. at ¶38. The individual provided a description of a person who conducted work at the property from time to time and described him as an older man, in his mid-50s, Black; the individual did not know the person's identity. Dkt. No. 106 at ¶¶17, 48; 106-2 at T01:1:21:12-29Z.

Milwaukee Police Department SOP 540 provides information related to board-up services and includes a link to the Department of Neighborhood Services (DNS) website and the County Assessor's webpage to ascertain property ownership information. Dkt. No. 111 at ¶40. The publicly accessible DNS website does not provide telephone contact information for property owners, or information about who to contact if the property owner does not reside at the property. Id. at ¶41.

The officers averred that they believed that the owner or occupant of the property (now identified as the plaintiff) was the victim of the alleged entry/burglary in progress that prompted the search of the property and the investigation they conducted. Id. at ¶44. Tate noted that there still was a television on the wall. Dkt. No. 109-2 at T1:06:27Z. Although he found the broken window, id. at T1:06:43, Tate admitted it was hard to tell if anything

had been taken, id. at T1:06:43Z. The officers didn't think there had been a television in the bedroom. Id. at T1:07:46-50Z. Tate confirmed that there was nothing in the attic, id. at T1.07:54Z, and the officers cleared all the floors. Dkt. Nos. 106-2, 107-2, 109-2. While in the basement, one of the officers concluded that "he be drinking and fucking down here," dkt. no. 109-2 at T01:04:50Z. Back upstairs, the officer commented that "he made a little sterno here, either that or he's cookin' crack." Dkt. No. 106-2 at T01:09:04-09Z.

Lautenbach subsequently returned to the house to investigate the alleged burglary; no one was at the property. Dkt. No. 111 at ¶45. The defendants say that Lautenbach returned "a while later;" the plaintiff asserts that Lautenbach returned around June 7, 2020—two weeks after the plaintiff filed his initial complaint in federal court. Id. Lautenbach says he left his business card, but that the plaintiff did not contact him; the plaintiff says Lautenbach left "a pink piece of paper with PoliceCop names and IR number." Id. Although Wierzchowski avers that he properly inventoried the firearm for safekeeping; the plaintiff asserts that this cannot be so. Id. at ¶46.

### III. Parties' Arguments

#### A. Defendants' Brief (Dkt. No. 104)

The defendants argue that the plaintiff cannot sue the Fire and Police Commission or the Milwaukee Police Department under §1983 because neither the Commission nor the police department are "persons;" they are agencies of the city. Dkt. No. 104 at 11. The defendants move to dismiss former Police Chief Alfonso Morales and former Mayor Tom Barrett because the plaintiff has not alleged that they were personally involved in the incident. Id. at 12. They assert that the plaintiff alleges only that Morales supervised the officers and that Barrett failed to "stop redlining in this city." Id. at 12, 13. As for the City of

Milwaukee, the defendants argue that the plaintiff has failed to plead or support a Monell claim against the city. Id. (Citing Monell v. Dep't of Social Serv's of City of New York, 436 U.S. 658 (1978), holding that a municipality may be held liable under §1983 only if the plaintiff demonstrates that his constitutional rights were violated as the result of a policy, pattern or practice of the municipality).

Next, the defendants address the plaintiff's "claim of an equal protection violation," arguing that that claim "rests on Former Chief Morales and MPD's 'de-facto' policy of violating rights." Id. at 14. The defendants contend that the plaintiff has not identified any individuals who were similarly situated to him but were treated differently by the officers. Id. at 15. The defendants assert that because the searching officers did not know anything about the plaintiff before or during the search of the property and the removal of the gun, the search could not have been discriminatory against the plaintiff. Id. The defendants argue that the plaintiff has not alleged sufficient facts to demonstrate discriminatory effect. Id.

The defendants ask the court to dismiss the Fourth Amendment claims against the searching officers because the officers entered the home in response to a dispatch call that a burglary was in process and that two individuals had been observed removing televisions. Id. at 16. The searching officers maintain that exigent circumstances "certainly existed that authorized their entrance into the property." The officers recount that when they arrived on the scene, they observed two open points of entry—a side door ajar and a broken window—as well as yard signs indicating that the property was either for sale or rent. Id. They maintain that the totality of the circumstances supports the objectively reasonably belief that a burglary was occurring and

that any occupants might be in danger. Id. at 17. The searching officers assert that they walked through the property to determine whether a burglary had occurred to and to gather information about the identity of the owners. Id.

The searching officers argue that they lawfully removed the firearm—which they assert was "clearly visible to them while walking through the property"—for safekeeping. Id. They insist that it is "important for this Court and for Plaintiff to note that the firearm was not taken as evidence of any crime that Plaintiff had committed; in fact, the ownership of the firearm was unknown to the officers at the time." Id. at 18. The defendants say that "[a]s per MPD Standard Operating Procedure (SOP) 560," when there are no other means to safeguard the property, officers can remove firearms from properties for safekeeping, for protection from loss, theft, misuse, damage or due to owner incapacity. Id. The defendants assert that the standard operating procedure cited by the plaintiff (SOP 540) applies to a totally different set of circumstances—board-up services for premises that officers forcibly enter and damage. Id. at 19.

The defendants ask the court to dismiss the plaintiff's claim of intimidation, which is based on the plaintiff's allegation that on July 5, 2020, an officer parked in front of the plaintiff's car and sat there for an unspecified time. Id. The defendants contend that the plaintiff called 911 and "was informed that there may have been an incident in the area requiring MPD's presence." Id. They assert that there is no evidence that the squad car was in the area to intimidate or harass the plaintiff. Id. at 20.

Finally, the searching officers argue that they are entitled to qualified immunity. Id. They say that it is a "common sense notion" that police may enter a home and search if a burglary may be in progress. Id. They reiterate

that they swept the house, then walked through to determine whether a burglary had occurred and to obtain ownership information. Id. They say that while walking through, they encountered things that "they would not normally encounter in plain view"—large propane tanks, hand wiring and batteries—which they say were potential safety hazards. Id. 21. They claim that they also "observed a firearm." Id. The defendants insist that they were not "rifling through Plaintiff's home or belongings in any attempt to find or secure evidence to use against the Plaintiff;" they say they were there only to secure evidence of a crime scene—one where the plaintiff may have been the victim of a crime. Id. The defendants state that, in doing so, "they did not want to leave a firearm behind," and that they took the gun for no other reason than "to prevent harm from occurring." Id. According to the defendants, "no reasonable officer could conclude based on the exigent circumstances in this case, that performing the search of the plaintiff's home and removing the firearm from the property for safekeeping was unlawful." Id. at 22. The officers maintain that there is no case law that clearly precludes the actions they took in this case. Id.

B.    Plaintiff's Brief in Opposition (Dkt. No. 113)

The plaintiff filed three briefs in opposition to summary judgement. As the court noted in an earlier footnote, its local rules allow *one* brief in opposition, limited to thirty pages. Civil L.R. 56(b)(2)(A) and (b)(8)(A). The court received the first, twenty-seven-page brief on January 6, 2022 and the second, twenty-eight-page brief the next day. Dkt. Nos. 112, 113. Two days later, the court received from the plaintiff a two-page memorandum of law titled "Plaintiff's Memorandum of Law in Support of Plaintiff's Responsibility to Prove the Right to be Free from Unreasonable Search and Seizure was Clearly Established." Dkt. No. 114.

The first two briefs appear to be identical except that the second brief has an additional section at the end titled, "The right to be free from unreasonable search and seizure is clearly established." Dkt. No. 113 at 26. The final page of the second brief includes citations to four cases in support of this argument. Id. at 27. Because the second brief seems to cover most of the arguments and authority from the other two filings, the court cites to the second brief.

The plaintiff argues that the officers conducted an unreasonable search of his home and seizure of his property, followed by a "sloppy cover up." Dkt. No. 113 at 3. He acknowledges the "exigent circumstances" exception to the warrant requirement, but argues that once officers enter a space because of exigent circumstances, "a subsequent search or seizure must be justified by a warrant, or exception to the warrant requirement." Id. at 6. The plaintiff concedes that under the exigent circumstances exception, officers can enter a home to look for a suspect or victim, but he says that once "the search for the suspects and victims had terminated," the defendant officers have no authority to search further. Id. The plaintiff asserts that the officers searched the house, then lingered for an additional six minutes after they had cleared it. Id. at 4. He asserts that it was then that the officers found a gun in the cabinet, opened luggage, called in the serial number on the gun and illegally searched the refrigerator and freezer. Id. The plaintiff argues that after learning the gun was not stolen, the officers opened a laminated, particle-board wall that contained a leather computer bag with tools inside. Id. at 4-5. The plaintiff contends that the officers rummaged through that bag and continued to search the area where they'd found the gun, all without a warrant. Id. at 5. The plaintiff asserts

that the officers went to the basement to search for "more guns, contraband, and anything they could fit into their pockets." Id.

The plaintiff notes that at this point, the officers began to question whether they had authority to take the gun. Id. The plaintiff says that Wierzchowski violated protocol by using his cell phone, that he did not provide dispatch with enough information to determine whether the gun was stolen and that all the officers violated protocol by deactivating their body cameras while they still were at the scene. Id. He writes:

> Also, the defendants ignore their own MPD SOP 85, which explicitly states there is no "gun exception" to the 4th Amendment's warrant requirement - *During the inventory process, the police will remove and seize items to prevent them from being lost or stolen. If no charges are issued, and the seized items are not needed for any other purpose, they are returned to the rightful owner upon discharge from the police station. (R2FA 25\*).* PCs were confused. They did not know how to inventory the firearm without knowing who the property owner was. "We don't even have …duh, like, a name" (see generally T01:14:45Z) and R2FA 26. (footnote 1)

Id. at 6.

The plaintiff relies on SOP 85, which he says declares that there is no "crime scene exception" to the Fourth Amendment. Id. at 7. He maintains that the SOP states that all police officers "must be able to articulate consent, plain view, search incident to arrest, or exigent circumstances." Id. He says that the operating procedure on which the defendants rely—SOP 540—"clearly requires MPD to make a reasonable attempt to notify the property owner or custodian." Id. at 8.

The plaintiff next says that the defendants are attempting to justify the search "based on some type of alleged evidence of squatters . . . ." Id. at 9. He says, however, that the police reports made no mention of any evidence of squatters, and that the defendants didn't find squatters inside. Id. The plaintiff

14

then says that the defendants are trying to justify the search "based on some type of alleged evidence of batteries, hand electrical wiring, and tanks." Id. at 10. He again notes that the police reports don't mention any hazards, and asserts that "one could very well make a case that the PoliceCops were derelict in there [sic] duty when they left the house without confiscating the propane tanks, batteries, and when did they not report to WE Energies that the grounding and bonding from the electrical panel was an attempt to steal power." Id. at 10. The plaintiff states, "Mincey,[4] holding that creating a crime scene exception for a warrantless search "'is inconsistent with the Fourth and Fourteenth Amendments.'"" Id. Reiterating that the officers had no legal authority to "begin a crime scene investigation," the plaintiff asserts that "[w]hen uncertainty arises regarding the legality of a crime scene search, the Milwaukee County District Attorney's office should be contacted for advice." Id.

The plaintiff says that for the officers to "rummage at will among his property and papers in search of whatever can convict him" should have required a warrant, and he suggests that the officers' judgment was compromised when they went in search of "bigger and better things." Id. at 11. He points out that the gun was kept in a place too small for a person to be hiding. Id. The plaintiff asserts that "the protective sweep was over at T01:03:40Z when the PCs holstered their guns, activated their flashlights, and began to talk about the tilework in the bathroom." Id. The plaintiff describes a "Neighborhood Task Force Street Crimes Unit" of the police department, which he says was assigned to "patrol 'hot spots' in Milwaukee's slum ghetto." Id. He asserts that this task force was "declared illegal and no longer active" when the

---

[4] Presumably Mincey v. Arizona, 437 U.S. 385 (1978) (holding that a four-day, warrantless search of the defendant's residence after he was arrested for allegedly shooting a police officer violated the Fourth Amendment).

officers searched his home, but that the officers were "guided by their 'broken windows' system of policing that MPD adopted in 2008." Id. He says that an officer (apparently not one of the defendants) testified that part of the task force's initiative was to "look for smaller infractions and hope that possibly they may lead to bigger and better things," creating a risk of police overreach. Id. at 11-12.

The plaintiff contends that the search was pretextual and accuses the officers of shifting from a "probable cause" to "possible cause" standard. Id. at 12. He denies that the officers were walking through the property; he argues that they were investigating—searching—the property for squatters or evidence of who owned the property or the gun. Id. He maintains that the officers were looking to see if the occupant was "stealing power, I mean look at all this shit." Id. (citing T01:05:22Z). To support his theory that the officers' proffered reasons for the search were pretextual, the plaintiff points to various points in the camera footage:

- L-T01:17:36Z Officer has a Greyhound bus ticket in his hand with the plaintiff's name in the upper left corner. Id. at 13.

- L-T01:17:29Z Wierzchowski read the Clay County Personal Property Tax Statement with the plaintiff's name on it. Id.

- L-T01:15:59Z Can see a bank statement from National Bank of Kansas City on the top of the mini fridge but officers look inside of the adjacent spice cabinets.

- T01:16:17Z An officer says, "I bet this guy has some stuff hidden in here."

The plaintiff reiterates that SOP 540 requires officers to make a reasonable attempt to contact the property owner in the aftermath of a burglary and gives specific instructions on how to accomplish this task. Id. at 13. The plaintiff insists that that the officers could have used the computer in their car to

16

access the City Assessor's home page to find the owner. Id. He says the defendants never contacted him. He recounts that Lautenbach said "gotta make sure we aren't leaving anything else behind," then continued to search without a warrant. Id. at 14 (citing Dkt. No. 109-2 at T01:13:34Z).

The plaintiff next focuses on Wierzchowski's failure to disclose the fact that gun was not stolen, asserting that this was exculpatory evidence and citing "Brady." Id. at 17. He says that Wierzchowski's report stated, "STOLEN FIREARM RECOVERED FROM HOUSE CLEARING." Id. The plaintiff also argues that the Wierzchowski violated his due process rights by including fabricated information in his report, such as stating that the house was vacant and the gun was stolen. Id. at 18.

The plaintiff argues that the Second Amendment guarantees the right to bear arms and asserts that it "protects against searches for and seizures of firearms." Id. at 18-19. He reiterates that there is no "gun exception" to the Fourth Amendment. Id. at 19.

The plaintiff next asserts that the city is not entitled to summary judgment on his Monell claims, and references a "policy sanctioning warrantless searches whenever contraband is found in plain view." Id. at 20. He then says, however, that if the city attorney, his deputies and the chief of police "are willing to turn a blind eye to the alleged illegal search that was driven by the racist attitude of the PCs, then so be it." Id. He says that he "will not be bringing any Monell claims listed in this section V. to this court," and that he will not "be advancing the intimidation claims." Id.

As for the defendants' qualified immunity argument, the plaintiff says that he has a legitimate expectation of privacy in his home. Id. at 22. He asserts that his house had a fence, that the front and side doors were locked

and had wrought iron security doors and that the windows (except the one the burglar entered) had iron or steel burglar bars. Id. He contends that he had things in his house that he intended to keep private. Id. at 23.

Finally, the plaintiff argues that the city does not have an adequate procedure for the return of firearms. Id. He reports that he went to the "gun desk" on five separate occasions—most recently on December 8, 2021. Id. According to the plaintiff, SOP 560 requires that firearms may be released for lawful return to an owner/claimant who is not prohibited by law from possessing the guns. Id. He says that the defendants have deprived the plaintiff of his property by failing to comply with their own procedure; citing Wis. Stat. §968.18, he asserts that the officers should have issued a properly completed Property Receipt. Id. at 23-24. He asks why Wierzchowski took extraordinary measures to show the gun as stolen, why Wolfe was asked to print a report that the gun was stolen out of Detroit and why, if the officers believed the gun was stolen from Detroit, it wasn't sent to Detroit. Id. at 24. He asks why he has not been able to get his gun back. Id.

In conclusion, the plaintiff argues that the officers looked through the drawers in the bedroom but missed the remote for the television that was stolen and stepped around the DVD (which had been attached to the television that was stolen). Id. at 25 (Dkt. No. 109-2 at T0:1:07:27Z). He argues that even a rookie should have known there would be valuables in the bedroom, particularly when the house had only one bedroom set up. Id. at 25. The plaintiff asks how the officers can know what was stolen if they didn't know what was in the house before the burglary. Id. The plaintiff suggests that this is a case of implicit bias—documented on the "cop cams." Id. The plaintiff argues

that his sworn testimony and the body cameras provide a sufficient basis for denying the defendants' motion. Id. at 26.

C.    Defendants' Reply Brief (Dkt. No. 115)

The defendants reply that they didn't need a warrant because the plaintiff was not arrested and never was a suspect—he was the possible victim. Dkt. No. 115 at 3. The defendants maintain that the officers responded to a call of a burglary in progress. Id. They assert that the search was constitutional based on exigent circumstances—the fact that a burglary might have been in progress. Id. They distinguish cases the plaintiff cited. Id. at 4-6. They argue that the plaintiff has presented no evidence that the search was pretextual. Id. at 6-7. They reiterate their assertion that they are entitled to qualified immunity. Id. at 6.

The defendants also address the plaintiff's Second Amendment arguments. Id. at 7. They assert that they did not take away the plaintiff's right to bear arms when they removed a firearm from his burglarized home for the protection of the community and emphasize that the MPD has a procedure in place for property return. Id. To the extent that the plaintiff now argues that property return process is unconstitutional, the defendants point out that the plaintiff did not make that claim in the operative complaint. Id.

IV.    **Analysis**

A.    Milwaukee Police Department and Fire and Police Commission

Section 1983 allows suits against any "person" who violates another person's constitutional rights under color of state law. Neither the Milwaukee Police Department nor the Milwaukee Fire and Police Commission are "persons." And while the Supreme Court's decision in Monell allows a plaintiff to sue a municipality under §1983 if his civil rights were violated because of

19

the municipality's policies, customs or practices, the police department and the Fire and Police Commission are not municipalities. They are *agencies* of a municipality—agencies of the city of Milwaukee. State law determines the capacity of an entity to sue or be sued. Fed. R. Civ. P. 17(b). Wisconsin Statute §62.50 governs Wisconsin police departments (including the Milwaukee Police Department), as well as mandating police and fire commissions; and it does not authorize the police department to sue or be sued. See Grow v. City of Milwaukee, 84 F. Supp. 2d 990 (E.D. Wis. 2000) (abrogated on other grounds by Driebel v. City of Milwaukee, 298 F.3d 622 (7th Cir. 2022)). Because the police department is an agency of the city of Milwaukee, it cannot be sued separate from the City. See Averhart v. City of Chi., 114 F. App'x 246, 247 (7th Cir. 2004)). The same is true of a Wisconsin fire and police commission. Shabani v. City of Madison, No. 19-cv-65-bbc, 2019 WL 1060613, at *2 (W.D. Wis. Mar. 6, 2019) (Police and Fire Commission is "a city agency or department that cannot be sued under § 1983 separately from the City of Madison.").

The court will dismiss the Milwaukee Police Department and the Milwaukee Fire and Police Commission as defendants.

B.    Former Police Chief Alfonso Morales and Former Mayor Tom Barrett

1.    *Former Police Chief Alfonso Morales*

The operative complaint alleges that the city of Milwaukee is responsible for training, supervising and disciplining Milwaukee Police Department employees "through its Chief of Police . . . ." Dkt. No. 45 at ¶5. It states:

> Defendant Chief of Police of the Milwaukee Police Department. In that capacity he oversees the MPD. By law, custom, defacto or otherwise, and/or delegation, he has policymaking authority over the police department for all actions at issue in this case. He is responsible for ensuring that the policies and practices of the MPD

20

comply with federal and state requirements for the treatment of citizens. He is sued in his official capacity for all the constitutional claims at issue arising out of Defendant's unlawful racially motivated tactics. At all times relevant to this action, Chief was acting under color of state law and within the scope of his employment with the MPD or Milwaukee. Alphonso Morales was, at all times relevant, the Chief of Police of the MPD. Morales was unanimously demoted by the commission for his failed interactions with black people. He resigned from MPD in August 2020 after the demotion.

The Chief is sued in his personal, official, and individual capacities pursuant to Wisc. stat. § 466.01 et seq. and other applicable law. Because Civil Asset forfeiture is the mechanism how they fund the MPD in part, Morales was guilty of encouraging, sanctioning, and failing to rectify the MPD's unconstitutional practices, despite being fully on notice that such violations were occurring.

Id. at ¶6. It also asserts that Morales and the Fire and Police Commission are "Defendant Milwaukee's final policymakers with respect to the policies, practices, and customs, law enforcement oversight, training, supervision, and monitoring." Id. at ¶7.

Later in the complaint, the plaintiff alleges that the Milwaukee Police Department had a "de-facto policy" of condoning illegal searches/seizures and violating individuals' equal protection rights, and that this policy included "defendant chief of cops', failure to adequately discipline the defendant cops for such violations." Id. at ¶40. The plaintiff avers that these policies "were officially adopted, expressly or implicitly, or practiced or promoted by the Milwaukee, through its Chief of Police . . . ." Id. The plaintiff alleges that the *de facto* policy of illegal searches/seizures and violating equal protection rights "permitted, encouraged, tolerated and ratified" the actions of all of the defendants "in malicious or reckless disregard or with deliberate indifferent to [the plaintiff's] Fourth and Fourteenth Amendment rights by, among others, the defendant Chief's failure to adequately discipline the cops for their unlawful

21

conduct and not just for failing to supervise the situation as in the three cop defendants discipline." Id. at ¶42a.

The plaintiff has sued former Milwaukee Police Chief Morales in his official capacity. "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." Bridges v. Dart, 950 F.3d 476, 478 n.1 (7th Cir. 2020) (quoting Kentucky v. Graham, 473 U.S. 159, 166 (1985)). In this instance, the court treats an official capacity suit against former police chief Morales as a suit against the city of Milwaukee. The court addresses the plaintiff's claims against the city later in this order.

The plaintiff's claim against Morales in his individual/personal capacity comes down to an assertion that Morales was the supervisor of the officers who searched the plaintiff's home and that Morales should be held liable under a theory of supervisory liability. "To maintain an action for supervisory liability . . . , [a plaintiff] . . . must present evidence that the defendant[] violated the Constitution through [his] own conduct." Stockton v. Milwaukee Cty., 44 F.4th 605, 619 (7th Cir. 2022) (citing Perez v. Fenoglio, 792 F.3d 768, 781 (7th Cir. 2014)). "An officer may be liable in a supervisory capacity if he was 'personally involved in [a] constitutional violation.'" Milchtein v. Milwaukee Cty., 42 F.4th 814, 824 (7th Cir. 2022) (quoting Gill v. City of Milwaukee, 850 F.3d 335, 344 (7th Cir. 2017)). "This might occur if a supervisor knowingly facilitates, approves, or condones constitutional violations carried out by his subordinates." Id. (citing Matthews v. City of E. St. Louis, 675 F.3d 703, 708 (7th Cir. 2012)).

The plaintiff has not alleged that former police chief Morales had any personal involvement in the search of the plaintiff's home on December 2,

2019, or that Morales even knew anything about the search. The plaintiff has not alleged that Morales knowingly facilitated that particular search, or approved of it, or condoned it. The court will dismiss Morales as a defendant.

        2.    *Former Mayor Tom Barrett*

While the operative complaint names "Mayor Tom Barrett" in the caption, it does not describe or list him in the "Parties" section at pages 2-5. (Barrett was mayor of Milwaukee from 2004 to 2021. https://emke.uwm.edu/entry/milwaukee-mayors/). The complaint does not allege that Barrett was involved in the December 2, 2019 search of the plaintiff's home, that he held any supervisory position over the officers who participated in that search or that he was aware of the search.

The one allegation against Barrett is contained in a section of the operative complaint titled "Washington Heights." Dkt. No. 45 at 14. "Washington Heights" is a Milwaukee neighborhood bounded by Wisconsin Highway 175 on the east, North Avenue on the north, 60th Street on the west and Vliet Street on the South. https://emke.uwm.edu/entry/washington-heights/. This section of the operative complaint states as follows:

> 53.    Milwaukee might be the most segregated city in the US. Plaintiff alleges that 53216, a predominantly black zip code, is policed differently than white zip codes.

> 54.    The former chief cop acknowledges this: "Yes, of course we are going to stop lots of innocent people. The point is, do folks understand what their role is as a cooperative citizen in having a safe environment." When questioned about the Milwaukee Journal Sentinel findings, Flynn[5] publicly stated that such racial disparities are to be expected. Flynn told the Milwaukee Journal Sentinel, "If we are going to heavily engage with those communities that are both victimized and from where a significant majority of our offenders

---

[5] Edward A. Flynn was chief of the Milwaukee Police Department from 2008 to 2018. https://city.milwaukee.gov/police/About-MPD/Shares/Chiefs-of-Police.

come, we are going to generate disparities because of where we're physically located."

55. Our courts appear to concur with Flynn. (see exhibit VI)

56 A red line still exists in Milwaukee on North Avenue that extends west from 48th Street to the county line. Virtually no black property-ownership exist south of the red line. Exhibit V shows why the red line still exists. Maintaining Washington Heights whiteness is as simple as saying, "I'm sorry, but I couldn't work the computer system."

57. In other words, in Milwaukee, if you are black, the redlines exclude you from certain neighborhoods, and the areas that are available to you are saturated with cops, even though there is no significant evidence that those areas have more crime. see exhibit VII.

*Exhibit VII*

*A black Milwaukee driver is seven times as likely to be stopped by city police as a white resident driver, a Journal Sentinel analysis of nearly 46,000 traffic stops has found.*

*Police also searched black drivers at twice the rate of whites, but those searches didn't lead to higher rates of seized weapons, drugs or stolen property.*

*Source – Ben Poston of the Journal Sentinel*

*Dec. 03, 2011*

58. Mayor Barrett has done nothing to stop this redlining in this city.

Dkt. No. 45 at 14-15.

The operative complaint raises nine claims: illegal search (id. at ¶71); illegal seizure (id. at ¶¶72-74); fabrication of evidence (id. at ¶¶75-79); selective enforcement (id. at ¶¶80-82); negligent infliction of emotional distress (id. at ¶¶83-85); failure to train (id. at ¶¶86-88); failure to supervise (id. at ¶¶89-91); equal protection under the Fourteenth Amendment (id. at ¶¶92-95); and intimidation (id. at ¶96). None of these claims allege "redlining"—discriminatory lending practices" that preclude "minority families from purchasing homes in

24

affluent areas." Texas Dep't of Housing and Community Affairs v. Inclusive
Communities Project, Inc., 576 U.S. 519, 529 (2015). And police officers, police
departments and police commissions are not the appropriate defendants in a
redlining suit; plaintiffs who believe they have been the victims of redlining sue
the insurance companies and any governmental officers or entities the
plaintiffs believe supported the insurance company's discriminatory lending
practices. Any claim that former Milwaukee Mayor Tom Barrett failed to
prevent redlining belongs in a different lawsuit, and there is no evidence in *this*
lawsuit that Tom Barrett had anything to do with the December 2, 2019
search. Because the complaint does not allege any personal involvement by
Tom Barrett in the events of December 2, 2019, the court will dismiss him as a
defendant.

C.    City of Milwaukee

As noted above, §1983 allows a plaintiff to sue a "person" who, acting
under color of state law, violates his civil rights. The City of Milwaukee is not a
person. The Supreme Court held in Monell, 436 U.S. at 690, that a local
government could be "sued directly under § 1983 for . . . relief where . . . the
action that is alleged to be unconstitutional implements or executes a policy
statement, ordinance, regulation, or decision officially adopted and
promulgated by that body's officers." A local government entity also may be
liable under § 1983 if the constitutional violation resulted from a "custom,"
"even though such a custom has not received formal approval through the
body's official decisionmaking channels." Id. at 691.

The operative complaint alleges that the city of Milwaukee operates the
Milwaukee Police Department and that it is legally responsible for the police
department. Dkt. No. 45 at ¶5. It says that the plaintiff is basing all his claims

25

"as to Defendant City of Milwaukee and the MPD on the doctrines of respondent [sic] superior or vicarious liability, and municipal liability pursuant to" <u>Monell</u>. <u>Id.</u> The complaint asserts that "Milwaukee is ultimately responsible for the training, supervising, and discipline of MPD employees and the creation and implementation of its policies and procedures through its Chief of Police, and had ultimate control and authority over MPD and all Defendants . . . ." <u>Id.</u> It also asserts that the city is obligated to indemnify the other defendants under Wis. Stat. §985.46. <u>Id.</u>

The operative complaint later alleges that the "race-based policing policies under former chief cop Flynn were so heavily engrained in Milwaukee cop culture, that they continue long after Flynn's ouster." <u>Id.</u> at ¶37. It asserts that the "unlawful conduct" described in the complaint "was also undertaken pursuant to the de facto policy and practice of the City of Milwaukee." <u>Id.</u> at ¶39. It describes this "policy" as "condoning illegal search seizure and/or otherwise violating person's equal protection rights . . . ." <u>Id.</u> at ¶40.

In his brief in opposition to the defendants' summary judgment motion, the plaintiff argues that the city is not entitled to summary judgment on the <u>Monell</u> claim. Dkt. No. 112 at 20. He asserts that "[i]f policy-makers adopt an official policy which violates clearly established law of which a reasonable person should have known, liability could arise." <u>Id.</u> He gives the example of a policy that sanctions "warrantless searches whenever contraband is found in plain view." <u>Id.</u> He then contends that everything else in his brief demonstrates that the city is not entitled to summary judgment on the <u>Monell</u> claims. <u>Id.</u>

But the plaintiff then says, "I will not be bringing any <u>Monell</u> claims listed in this section V. to the court." Dkt. No. 112 at 20. It appears that the plaintiff is both arguing his <u>Monell</u> claim and withdrawing it. Although the

26

court has no need to analyze a claim voluntarily withdrawn by a plaintiff, the court notes—in an abundance of caution—that even if the plaintiff did not intend to withdraw his Monell claim, the court would be obligated to grant summary judgment in the city's favor on that claim.

A complaint—the document that starts a lawsuit—does not need "to include every detail or fact related to the basis" of the plaintiff's allegations; the complaint needs only to provide "'enough details about the subject-matter of the case to present a story that holds together.'" Reed v. Palmer, 906 F.3d 540, 548 (7th Cir. 2018) (quoting Catinella v. Cty. of Cook, 881 F.3d 514, 516 (7th Cir. 2018)). Summary judgment—a process that happens after the parties have exchanged discovery—is different. As the Seventh Circuit repeatedly has said, "summary judgment 'is the "put up or shut up" moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.'" Wade v. Ramos, 26 F.4th 440, 446 (7th Cir. 2022) (quoting Schacht v. Wis. Dep't of Corr., 175 F.3d 497, 504 (7th Cir. 1999)). At the summary judgment stage, it is not enough for a party to make allegations, even if the party believes those allegations to be true. At summary judgment, the party must present *evidence* to support the claims in the complaint. This is particularly true for a Monell claim. A plaintiff seeking to survive summary judgment on a Monell failure-to-train or failure-to-supervise claim must present *evidence* to support that claim, including evidence demonstrating that "a failure to train or supervise was 'the moving force' behind [the constitutional violation]." Barnes v. City of Centralia, Ill., 943 F.3d 826, 832 (7th Cir. 2019) (quoting Monell, 436 U.S. at 694).

In opposition to the defendants' motion for summary judgment, the plaintiff presented his own declaration, listing the exhibits he had provided and

27

declaring that they were true and correct; this exhibit contains no evidence of a policy, practice or procedure. Dkt. No. 110. He attached seventy pages of exhibits to his response to the defendants' proposed findings of fact; he attached the same seventy pages of exhibits to his first memorandum of law in opposition to the defendants' motion for summary judgment. Dkt. Nos. 111-1, 112-1. None of those pages—including two Wisconsin Court of Appeals decisions involving the police department—constitute evidence of a policy, practice or procedure of failing to train, failing to supervise or condoning unlawful searches. The plaintiff has made many *allegations* about the existence of policies, practices or procedures: failures to properly train the defendants, failures to supervise the defendants, practices condoning illegal searches/seizures and violations of equal rights protections. But he has presented no *evidence* of any kind that supports those claims. The court will grant summary judgment in favor of the city on the plaintiff's <u>Monell</u> failure-to-train and failure-to-supervise claims (claims 6 and 7 of the operative complaint, Dkt. No. 45 at ¶¶86-91).

> ### D.   <u>Equal Protection/Selective Enforcement</u>

To state a claim for an equal protection violation, the plaintiff must "prove that the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose." <u>Chavez v. Ill. State Police</u>, 251 F.3d 612, 635-36 (7th Cir. 2001). "To prove discriminatory effect, [the plaintiff] must show that he was a member of a protected class and that he was treated differently from a similarly situated member of an unprotected class." <u>Alston v. City of Madison</u>, 853 F.3d 901, 906 (7th Cir. 2017) (citing <u>Chavez</u>, 251 F.3d at 636). A plaintiff may show those things "either by statistical analysis or by

identifying a particular similarly situated member of the unprotected class who was treated differently from him." Id.

The operative complaint alleges that the plaintiff is "a Black Negro male and a member of a protected class." Dkt. No. 45 at ¶3.[6] Race is a protected class. Hope v. Comm'r of Ind. Dep't of Corr., 9 F.4th 513, 529 (2021). The operative complaint also alleges that the plaintiff was fifty-seven years old as of December 2, 2019. Id. Age is *not* a suspect classification under the Equal Protection Clause. Kimel v. Florida Bd. of Regents, 528 U.S. 62, 83 (2000) (citations omitted).

Assuming that the plaintiff is a member of a protected class, he has neither presented statistical evidence showing that the defendants treated him differently from a similarly situated member of an unprotected class nor identified a member of an unprotected class who was similarly situated to him. He has not presented any evidence of discriminatory effect.

Even if the plaintiff had presented evidence of discriminatory *effect*, he also would have had to present evidence of discriminatory *motive*. The defendants have submitted evidence that they did not know who owned the home; the bodycam footage confirms that the officers didn't know who owned or occupied the home. After they finished their search and took the firearm, one of the officers asked a man on the street if he knew the home's owner; *after*

---

[6] The operative complaint was not sworn or verified. Dkt. No. 45 at 22. A plaintiff who declares under penalty of perjury that the complaint is true, and signs it, converts the factual assertions in the complaint into an affidavit for the purposes of presenting evidence at summary judgment. Ford v. Wilson, 90 F.3d 245, 247 (7th Cir. 1996). Because the plaintiff did not declare under penalty of perjury that the allegations in the operative complaint are true, the court cannot consider the factual allegations in that complaint as "evidence" presented by affidavit for the purposes of summary judgment.

*the fact*, that individual identified the person who occasionally worked on the residence as an older, Black man. Dkt. No. 111-1 at 45.

To demonstrate that a genuine issue of material fact exists, the rules require the plaintiff to provide "in the case of any disagreement, specific references to the affidavits, declarations, parts of the record, and other supporting materials relied upon," as well as opposing affidavits, declarations and other materials. Civ. L.R. 56(b)(2)(B)(i) and (b)(2)(C). In his response to the defendants' proposed findings of fact, the plaintiff provides some citations to the record evidence in support of his asserted disputes with those facts, but the citations support only inferences and speculation. For example, while the individual officers provided sworn affidavits that they did not know who lived in or owned the residence until after the fact, the plaintiff disputes this by asserting that Lautenbach admitted at his deposition that "District 7 had a heavy African-American population (95%) (condensed version of deposition, page 62)." Dkt. No. 111 at ¶12. From this broad fact, the plaintiff draws the conclusion that Lautenbach "was aware that it was likely that a black african-american negro was the likely occupant of the property." Id. This conclusion is not *evidence* that Lautenbach knew that the owner of the property was Black. And the plaintiff provided the court with only pages 14 through 21 of Lautenbach's deposition transcript. Dkt. No. 111-1 at 2-3. In some instances, he attempts to refute the defendants' findings of fact with newspaper articles. See, *e.g.*, Dkt. No. 111 at ¶31. The plaintiff has not provided *evidence* of discriminatory effect or discriminatory motive.

Nor has the plaintiff provided proof to support what is known as a "class-of-one" equal protection claim. "The Equal Protection Clause has . . . come to be understood to protect individuals against purely arbitrary government

classifications, even when a classification consists of singling out just one person for different treatment for arbitrary and irrational purposes." Geinosky v. City of Chi., 675 F.3d 743, 747 (7th Cir. 2012). "Class-of-one" claims are brought by plaintiffs who are "not suing as a member of an identifiable group, such as a race or a gender . . . ." Del Marcelle v. Brown Cty. Corp., 680 F.3d 887, 895 (7th Cir. 2012). While traditional equal protection challenges are concerned with governmental actions or classifications that treat one group differently from another, "a class-of-one equal protection challenge asserts that an individual has been 'irrationally singled out,' without regard for any group affiliation, for discriminatory treatment." United States v. Moore, 543 F.3d 891, 896 (7th Cir. 2008) (quoting Engquist v. Or. Dep't of Agric., 555 U.S. 591, 601 (2008)). To establish a "class-of-one" equal protection claim, a plaintiff must show that he was intentionally treated differently from others who were similarly situated to him, and he must demonstrate that the other, similarly situated people are "*prima facie* identical in all relevant respects or directly comparable . . . in all material respects." Id. (quoting Racine Charter One, Inc. v. Racine Unified Sch. Dist., 424 F.3d 677, 680 (7th Cir. 2005)).

The plaintiff has argued that the individual officers discriminated against him because he is Black; right away, that signals that he is pursuing a traditional equal protection challenge based on his membership in a protected class and not a class-of-one challenge. More important, the plaintiff has not identified anyone who was identical to him in the relevant respects. He has identified no "comparators" from whom the officers treated him differently. Without proof that there were similarly situated people from whom the officers treated the plaintiff differently, without any rational basis for the dissimilar treatment, the plaintiff has not presented any evidence that he could show to a

jury to prove a class-of-one equal protection claim. The court will dismiss the plaintiff's equal protection claim (claim 8, Dkt. No. 45 at ¶¶92-95.

The operative complaint also alleges "selective enforcement." Dkt. No. 45 at ¶¶80-82. "Racially selective law enforcement is a quintessential equal protection violation." Conley v. United States, 5 F.4th 781, 788 (7th Cir. 2021). "[T]he Constitution prohibits selective enforcement of the law based on considerations such as race." Wren v. United States, 517 U.S. 806, 813 (1996). Such purposeful discrimination violates "the Fifth Amendment's equal protection component." Conley, 5 F.4th at 788. "As with equal protection claims, both selective prosecution and selective enforcement require proof 'that the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose.'" Id. at 789 (quoting Chavez, 251 F.3d at 635-36). The court has concluded that the plaintiff has presented no evidence of discriminatory effect and no evidence of discriminatory purpose, so the court also will dismiss the selective enforcement claim (claim 4, Dkt. No. 45 at ¶¶80-82).

E.    Intimidation Claim

The plaintiff no longer is pursuing his intimidation claim. Dkt. No. 112 at 20. The court will dismiss the intimidation claim (claim 9, Dkt. No. 45 at ¶96).

F.    Remaining Claims Against Searching Officers

That leaves claim 1—illegal search; claim 2—illegal seizure; claim 3—fabrication of evidence; and claim 5—intentional infliction of emotional distress.

1.    *Illegal Search and Seizure*

At the heart of the plaintiff's case are his allegations that the officers illegally searched his home and illegally seized his firearm (which it appears

32

has not been returned). The defendants argue that they cannot have violated the Fourth Amendment because rather than searching for evidence to use *against* the plaintiff, they were searching on the plaintiff's behalf because they thought he might have been the victim of a crime. They also argue that exigent circumstances justified the warrantless search and assert that a standard operating procedure of the Milwaukee Police Department allowed them to seize the firearm.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The ""very core"' of this guarantee is "'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'"" Caniglia v. Strom, ___ U.S. ___, 141 S. Ct. 1596, 1599 (2021) (quoting Florida v. Jardines, 569 U.S. 1, 6 (2013)). "Warrantless searches are *per se* unreasonable under the Fourth Amendment, unless an exception applies." United States v. Smith, 989 F.3d 575, 581 (7th Cir. 2021).

The exigent circumstances exception to the warrant requirement applies "when 'the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable.'" Lange v. California, ___ U.S. ___, 141 S. Ct. 2011, 2017 (2021) (quoting Kentucky v. King, 563 U.S. 452, 460 (2011)). It "enables law enforcement officers to handle 'emergenc[ies]'—situations presenting a 'compelling need for official action and no time to secure a warrant.'" Id. (quoting Riley v. California, 573 U.S. 373, 402 (2014)). In determining whether exigent circumstances existed, the court looks at the totality of the circumstances "confronting the officer as he decides to make a warrantless entry." Id. The Seventh Circuit has recognized that "where police reasonably believe that their safety, or the safety of the public, may be

33

threatened, exigent circumstances exist." United States v. Huddleston, 593 F.3d 596, 600 (7th Cir. 2010).

The record evidence demonstrates that exigent circumstances existed when the searching officers entered the home: the detailed history for the police call indicates that the 911 caller reported "2 men broke into a house for sale, they are taking out televisions." Dkt. No. 111-1 at 4. The officers arrived on the scene and found the side entry door ajar. Dkt. No. 106 at ¶13. The 911 call and the open door created exigent circumstances supporting immediate entry into the home because the officers had reason to believe that a burglary was occurring and that occupants or property could be in danger. See United States v. Richardson, 208 F.3d 626, 630 (7th Cir. 2000).

A jury will decide, however, whether the ensuing search was appropriately limited to the circumstances that justified the entry. The government must establish not only that exigent circumstances justified a warrantless entry into a residence, but also that "the ensuing search . . . was appropriately limited to the circumstances that justified it." United States v. Collins, 110 F.. App'x. 701, 705 (7th Cir. 2004) (quoting United States v. Salava, 978 F.2d 320, 324 (7th Cir. 1992)). "Once the officers legally entered the residence under exigent circumstances, a subsequent search or seizure must be justified by a warrant or an exception to the warrant requirement." United States v. Robles, 37 F.3d 1260, 1264 (7th Cir. 1994) (citing United States v. Rivera, 825 F.2d 152, 157 (7th Cir.), cert. denied, 484 U.S. 979 (1987)). In United States v. de Soto, 885 F.2d 354, 368 (1989), for example, officers conducted a warrantless entry due to exigent circumstances, "then secured the apartment and remained inside until a search warrant was obtained more than eight hours later."

34

The court has reviewed the three CDs in the record containing the bodycam footage. Officers found opened drawers in the bedroom but didn't think that anything had been taken from the home. They cleared the first floor, attic and basement, but went beyond a search for suspects by checking out the football cards in a cabinet, dkt. no. 107-2 at T01:11:33-39Z, and opening cabinet doors in the kitchen, id. at T01:14:20-43Z. One of the officers said, "kinda wonder what he has downstairs," id. at T01:13:02Z, before the officers returned to the basement a second time to "make sure there's no . . ." (without finishing the sentence), dkt. no. 106-2 at T01:15:16-18Z. In the basement they opened drawers on a workbench, id. at T01:15:56Z, and lifted a futon, id. at T01:18:20Z. A reasonable jury could find that once the officers had cleared the house and determined that no burglar was inside and no occupants were in danger, the officers nonetheless continued to search without any justifying exception to the warrant requirement. There is a genuine dispute of material fact as to whether the officers tailored the search to the exigent circumstances: the 911 report that a burglary was in progress.

A jury also will decide whether the defendant officers illegally seized the plaintiff's gun. "The seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity." Payton v. New York, 445 U.S. 573, 587 (1980). The officer retrieved the plaintiff's firearm from the top shelf of a kitchen cabinet that had glass doors; while the door was slightly ajar, the officer opened it fully to retrieve the gun. Dkt. No. 106-2 at T01:09:23-33Z. The officers insist that the firearm was in plain view, but it was in a cabinet (albeit with glass doors, one of which was slightly open), on the top shelf rather than at eye level or below and the officer had to open the cabinet door and take

35

the gun out of the cabinet to seize it. Again, there is a genuine dispute as to whether the officers were conducting a lawful search by the time they found and seized the firearm.

Nor have the officers alleged that there was "probable cause to associate the [gun] with criminal activity." The officers ran the serial number for the gun and learned that it was not stolen. Dkt. No. 109-2 at T01:13:33-44Z. They said that they would inventory the gun for safe keeping, but at least one officer questioned if they had the authority to just take it. Dkt. No. 107-2 at T01:19:14-30Z. On the way out of the home, one of the officers declared that the gun had been stolen. Dkt. No. 109-2 at T01:22:16Z. The detailed history of the police call, which was filed by the plaintiff, refers to a "stolen firearm recovered from house clearing." Dkt. No. 112-1 at 4. There is a genuine dispute as to why the officers took the firearm: although they said they were taking it for safekeeping, it appears that they may have been trying create the impression that the gun was stolen when they had confirmed that it was not.

The failure to follow state or local laws or procedures do not, in and of themselves, provide a cause of action under §1983 unless that failure also violates the Constitution. See Lafayette Linear v. Vill. of Univ. Park, Ill., 887 F.3d 842, 844 (7th Cir. 2018). But here, it is not clear whether the officers followed any of the Milwaukee Police Department's standard operating procedures, for stolen firearms or otherwise, which provides some circumstantial evidence that would justify skepticism of their stated reason for seizing the gun. SOP 560 required the officers to make "every effort to locate the owner of safekeeping property and return the property to them in a reasonable time." Dkt. No. 111-1 at 52. The plaintiff says he wasn't contacted until he filed this complaint and he says the firearm never has been returned.

While one officer stated that he left a card at the residence, the plaintiff provided a piece of paper that contains cryptic, handwritten notes:

P.O. Lautenbach
P.O. Wierzchowski
_____

Burglary
12-02-2019 6:43 p.
_____

CAD 19-336-2181
IR 19-336-0151

93J-7779

Dkt. No. 111-1 at 54. Nothing on this piece of paper advises the plaintiff that the officers had come to the house after a report of a burglary, swept the house, found no one home and taken a firearm for safekeeping. Nor did it ask that whoever found the piece of paper contact the police department to retrieve the gun. The court will deny the defendants' motion for summary judgment on Fourth Amendment illegal search and illegal seizure claims.

2. *Fabrication of Evidence*

The plaintiff's fabrication-of-evidence claim appears to relate to his assertion that although the officers confirmed while still in the house that the gun was not stolen, there is evidence that they nonetheless reported it as stolen. "Allegations of evidence fabrication may state a colorable due-process claim . . . ." Bianchi v. McQueen, 818 F.3d 309, 319 (7th Cir. 2016) (citations omitted). "But an act of evidence fabrication doesn't implicate due-process rights *unless* the fabricated evidence 'is later used to deprive the [criminal] defendant of her liberty in some way.'" Id. (quoting Whitlock v. Brueggemann, 682 F.3d 567, 580 (7th Cir. 2012)). "'[I]f an officer (or investigating prosecutor)

fabricates evidence and puts that fabricated evidence in a drawer, making no further use of it, then the officer has not violated due process; the action did not cause an infringement on anyone's liberty interest.'" Id. (quoting Whitlock, 567 F.3d at 582). The plaintiff has not alleged that he was arrested or charged or prosecuted. He has not alleged that the officers' characterization of the gun as stolen deprived him of any liberty interest, and he has not presented any evidence that it did. The court will dismiss the plaintiff's claim of fabrication of evidence.

### 3.   *Negligent Infliction of Emotional Distress*

The operative complaint alleges that the officers' conduct caused the plaintiff "physical pain, emotional distress, humiliation, and trauma." Dkt. No. 45 at ¶61. It alleges that all of his neighbors "witnessed the hour – long police occupation and search of his home," and that as a result, the plaintiff "suffered the indignity of being wrongfully branded as a criminal suspects [sic] due to race or ethnicity." Id.

Wisconsin recognizes claims for negligent infliction of emotional distress. See Pierce v. Physicians Ins. Co. of Wis., Inc., 278 Wis. 2d 82, 94 (Wis. 2005). To state a claim for negligent infliction of emotional distress, a plaintiff must show that the defendant was negligent with regard to the incident, that the incident was the cause of the plaintiff's emotional distress and that the emotional distress was severe. Camp *ex rel.* Peterson v. Anderson, 295 Wis. 2d 714, 724 (Wis. Ct. App. 2006) (quoting WIS JI-CIVIL 1511 (2006)).

38

The defendants did not move for summary judgment on this claim. While it is a state-law cause of action, not a federal one, 28 U.S.C. §1367(a) gives a federal court supplemental jurisdiction over state-law claims that are "so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." The plaintiff alleges that the defendants' actions in conducting the illegal search resulted in the negligent infliction of emotional distress. The court will exercise its supplemental jurisdiction and allow the plaintiff to proceed on this state-law claim.

### 4. *Brady Violation Argument*

The list of claims in the operative complaint does not include a Brady violation. The plaintiff raised a Brady argument for the first time in his first brief in opposition to the defendants' motion for summary judgment. Dkt. No. 112 at 17. "[A] plaintiff 'may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.'" Anderson v. Donahoe, 699 F.3d 989, 997 (7th Cir. 2012) (quoting Grayson v. O'Neill, 308 F.3d 808, 817 (7th Cir. 2022)). Even if the operative complaint had alleged that the defendants withheld exculpatory evidence under Brady v. Maryland, 373 U.S. 83 (1963), the court would have dismissed that claim. Brady is a doctrine that applies in *criminal prosecutions*; it holds that "the suppression by the *prosecution* of evidence favorable to an *accused* upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. As the

court already has noted, the plaintiff has not alleged that he was arrested, charged or prosecuted. There was no prosecutor to withhold exculpatory evidence from him. The court cannot grant or dismiss summary judgment on a claim the plaintiff has not brought, particularly a claim that has no factual basis. The court will not allow the plaintiff to proceed on any claim premised on Brady.

     5.    *Second Amendment Arguments*

Similarly, the list of claims at the end of the operative complaint does not include a claim that the defendants violated the plaintiff's Second Amendment rights; the operative complaint does not mention the Second Amendment. The first time the plaintiff mentioned the Second Amendment was in his first brief in opposition to the defendants' motion for summary judgment (Dkt. No. 112), filed fifteen months after he filed the operative complaint. The court cannot grant, or deny, the defendants' motion for summary judgment as to the plaintiff's Second Amendment claim, because he never made such a claim in his operative complaint. The plaintiff may not proceed on a Second Amendment claim.[7]

_____

[7] The court notes that even if the plaintiff had raised this claim in the operative complaint, he has not alleged that the searching officers seized his gun under a legislative regulation or restriction on firearm possession. See New York State Rifle & Pistol Ass'n, Inc. v. Bruen, ___ U.S. ___, 142 S. Ct. 2111, 2126 (2022) (discussing Second Amendment rights in the context of governmental regulation of firearm possession).

G.    Qualified Immunity

The defendants argue they are entitled to qualified immunity. Qualified immunity shields government officials from damages if their actions did not violate clearly established rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see also Volkman v. Ryker, 736 F.3d 1084, 1089–90 (7th Cir. 2013). Qualified immunity applies when a reasonable law enforcement officer in the defendant's position would have believed that at the time he acted, his actions were within the bounds of the law. Belcher v. Norton, 497 F.3d 742, 749 (7th Cir. 2007). The qualified immunity doctrine "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." Messerschmidt v. Millender, 132 S. Ct. 1235, 1244–45 (2012) (quoting Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2085 (2011)) (internal quotation marks omitted).

Once the defendants have raised qualified immunity, the plaintiff bears the burden of showing that the constitutional right allegedly violated was clearly established at the time of the challenged conduct. Purvis v. Oest, 614 F.3d 713, 717 (7th Cir. 2010). A plaintiff may prevail by showing that "the conduct [at issue] is so egregious that no reasonable person could have believed that it would not violate clearly established rights." Id. at 717–18 (quoting Wheeler v. Lawson, 539 F.3d 629, 639 (7th Cir. 2008)).

The Supreme Court has cautioned against defining clearly established law "at a high level of generality." White v. Pauly, 137 S. Ct. 548, 552 (2017).

Instead, "the clearly established law must be 'particularized' to the facts of the case." Id. (citing Anderson v. Creighton, 483 U.S. 635, 640 (1987)). "'The lack of specific precedent is not necessarily fatal to a qualified immunity defense because the Supreme Court has recognized that 'officials can still be on notice that their conduct violates established law . . . in novel factual circumstances.'" Leiser v. Kloth, 933 F.3d 696, 702 (7th Cir. 2019), cert. denied, 140 S. Ct. 2722 (2020) (quoting Safford Unified Sch. Dist. No. 1 v. Redding, 557 U.S. 364, 377-78 (2009); Hope v. Pelzer, 536 U.S. 730, 741-42 (2002)).

      1.    *The Search*

The searching officers argue they are entitled to qualified immunity because they did not violate any of the plaintiff's clearly established statutory or constitutional rights of which a reasonable person would have known. They insist that it is common sense that police officers may enter a house when there has been a report of a burglary and may walk through to secure the house and gather information.

While the searching officers talk about "common sense," their argument boils down to an assertion that there is clearly established law authorizing them to enter the property and conduct a protective sweep: the exigent circumstances exception to the warrant requirement. The court agrees that the exigent circumstances exception is clearly established law. It also agrees, and has found, that there were exigent circumstances on December 2, 2019 that justified the officers' *initial* entry into and sweep of the residence.

42

But the searching officers' argument does not address the clearly established case law holding that a search that ensues *subsequent to* a justified entry must be tailored to the reason for the entry. "A constitutional right is clearly established when 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" Estate of Escobedo v. Martin, 702 F.3d 388, 404 (7th Cir. 2012) (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001)). Above, the court discussed case law dating back to at least the late 1980s holding that once officers have justifiably entered and swept/secured the property, they need a warrant or an exception to the warrant requirement to conduct any further search. "[I]t is a touchstone of qualified immunity doctrine that 'a reasonably competent public official should know the law governing his conduct.'" Pritchard v. Hamilton Tp. Bd. of Trustees, 424 F.. App'x 492, 506 (7th Cir. 2011) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982)). "[W]e imput knowledge of clearly established constitutional caselaw to police officers when we state that the 'binding precedent from the Supreme Court, the [federal circuit court], the district court itself, or other circuits that is directly on point,' places a law enforcement official '"on notice that [his] conduct violates established law."'" Id. (quoting Holzemer v. City of Memphis, 621 F.3d 512, 527 (6th Cir. 2010)).

In Sutterfield v. City of Milwaukee, 751 F.3d 542 (7th Cir. 2014), the Seventh Circuit affirmed the district court's grant of qualified immunity where officers forcibly entered a  home in response to a 911 call about a woman who was at risk of committing suicide. The woman's psychiatrist had placed a 911

43

call after the woman left her office expressing suicidal thoughts. Id. at 545. The doctor had informed officers that the woman wore an empty gun holster to the appointment and had talked about blowing her brains out. Id. The officers prepared a statement of emergency detention under Wis. Stat. §51.15, entered the home, and secured the woman. Id. at 546-47. The officers then conducted a protective sweep, during which one of them saw a compact disc carrying case in plain view. Id. at 547. The case was locked; the officer picked it up, forced it open and found inside a semi-automatic handgun. Id. In the kitchen they found a BB gun made to resemble a Glock 29 handgun. Id.

The Seventh Circuit found that the intrusions into the woman's privacy were "profound," id. at 550, and balanced her Fourth Amendment rights and interests against a community interest (and the plaintiff's own interest) in protecting the plaintiff from harm, id. at 551. The court determined that the entry into the home was justified by the emergency aid doctrine, which is a subset of the exigent circumstances doctrine. Id. at 553. It also found that the forced entry and the protective sweep were reasonable. Id. at 566. The court concluded, however, that the search of the locked CD case was a "significant step beyond the search authorized by *Buie*"[8] because it was obviously too small to hide a person. Id. at 566. The court assumed that the search of the case,

_____

[8] Maryland v. Buie, 494 U.S. 325, 337 (1990), holding that the "Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene."

44

and the seizure of the gun inside it, were unlawful, then turned to qualified immunity. Id. at 571.

In discussing qualified immunity, the appellate court pointed out that the parties had not cited a Wisconsin case that "relied on the community caretaking doctrine to justify any search of the premises more intrusive than the sort of limited, protective sweep envisioned by Buie—that is, a search of places within the home that another person might be found." Id. at 577. It determined that opening the locked CD case was a "substantial step beyond the standard protective sweep and constituted a more substantial intrusion" on the plaintiff's privacy interests." Id. On the other hand, the court stated while it had not "found any Wisconsin case that invoked the community caretaking doctrine to sustain a search akin to that here, neither have we found anything that would preclude this result when the search is conducted for purposes of protecting someone's safety or well-being." Id. The Seventh Circuit concluded that a reasonable officer would have thought he was authorized by his community caretaker function to seize the gun for safekeeping; the officers knew the plaintiff had threatened to harm herself and potentially was in a "volatile state of mind," her psychiatrist thought she needed an intervention, she was facing short-term commitment under Wis. Stat. §51.15 and the officers had no idea who—including the woman's son—might have access to the home. Id. at 578.

The facts of Sutterfield are distinctly different from the facts here. In Sutterfield, the officers had facts strongly suggesting that Sutterfield was a risk

45

to herself and might have a gun—the doctor's report of her suicidal statement and the fact that she was wearing an empty holster—and were operating under their community caretaker function. The officers here acted on an anonymous call that someone was taking televisions from a house. While the officers in this case were justified in entering the home and conducting a sweep to make sure there was no one inside, the court has explained that it is not clear what justification the officers had for staying in the home and continuing to search it after clearing it.

While the officers' affidavits aver otherwise, the video evidence suggests that the search may have continued past the point where the officers could reasonably have believed that someone was in need of aid or that they reasonably could have believed that they had a compelling reason to open cabinets and drawers. There is clearly established case law—knowledge of which was imputed to the searching officers—that any search conducted after the exigent circumstances had been addressed required a warrant or another exception to the warrant requirement, and there is a genuine dispute of material fact as to whether the entire search was justified by exigent circumstances.

### 2. *The Seizure of the Gun*

There also is a genuine issue of material fact as to whether the officers had probable cause to seize the plaintiff's property—his gun—or whether there were exigent circumstances that justified their seizure of the gun. It is well-established law that seizures of property are *per se* unreasonable unless

46

accomplished by a warrant issued on probable cause, or unless there are exigent circumstances or some other exception to the warrant requirement that justify the seizure. See, *e.g.*, Payton, 445 U.S. at 587. Again, the court imputes knowledge of this well-established law to the searching officers.

The searching officers imply that SOP 560 authorized them to seize and/or take the firearm. SOP 560.00 states that its purpose is to give officers "instructions on the proper handling, storage, control, and disposition of all items *lawfully seized and placed on inventory*" by members of the police department. https://city.milwaukee.gov/police/About-MPD/Code-of-Conduct?FB_Values=!!&F81666_ajaxEnabled=0&F81666_DocID=338411&F81 666_keywordFilter=&F81666_PageNum=10& (SOP 560) (emphasis added). Section 560.10(C) includes in the definition of "evidence" an item that was taken "for protection from loss, theft, misuse, damage or due to the owner's incapacity and there was no other means to safeguard the property." Id. It requires department members to "make every effort to locate the owner of safekeeping property and return the property to them in a reasonable time." Id. The SOP lays out a detailed procedure for itemizing and inventorying items.[9] This SOP does not answer the question of whether the searching officers were violating the plaintiff's established Fourth Amendment rights when they conducted the post-exigent-circumstances search that revealed the firearm. It

---

[9] The court agrees with the defendants that, to the extent that the plaintiff is trying to challenge the constitutionality of the Milwaukee Police Department's inventory or property return procedures, he cannot pursue that claim because he did not raise it in the operative complaint.

47

does not answer the question of whether they were justified under clearly established law in seizing the gun. There are genuine disputes of material fact as to both of those questions.

Because the court imputes knowledge of the established law to the searching officers and because there are genuine disputes of material fact about whether they violated that established law, the officers are not entitled to qualified immunity. A fact-finder must determine whether there was an exception to the warrant requirement that justified the entire search of the residence and the seizure of the gun.

## V.    Conclusion

The court **GRANTS IN PART** the defendants' motion for summary judgment. Dkt. No. 103.

The court **DISMISSES** former Police Chief Alfonso Morales, the Milwaukee Police Department, Mayor Tom Barrett, the Milwaukee Fire and Police Commission and the City of Milwaukee as defendants.

The court **DISMISSES** the plaintiff's fabrication of evidence (Charge 3, Dkt. No. 45 at p. 17), selective enforcement (Charge 4, Dkt. No. 45 at p. 18), failure to train (Monell) (Charge 6, Dkt. No. 45 at p. 19), failure to supervise (Monell) (Charge 7, Dkt. No. 45 at p. 20), equal protection 14th Amendment (Charge 8, Dkt. No. 45 at 20) and intimidation (Charge 9, Dkt. No. 45 at pp. 20-21) claims.

The court **ORDERS** that the plaintiff may not proceed on <u>Brady</u> or Second Amendment claims because he did not bring such claims in the operative complaint.

The court **DENIES** defendants' motion as to the plaintiff's illegal search (Charge 1, Dkt. No. 45 at p. 17), illegal seizure (Charge 2, Dkt. No. 45 at p. 17) and negligent infliction of emotional distress (Charge 5, Dkt. No. 45 at p. 19) claims against Lautenbach, Tate and Wierzchowski.

The court will schedule a telephonic status conference to discuss with the parties next steps. Ahead of that status conference, the parties should consider whether they are willing to participate in mediation, how much time they need to prepare for trial and how much time they will need to try the case.

Dated in Milwaukee, Wisconsin this 30th day of March, 2023.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

49